UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KEITH ZOLL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 1:12-CV-207 (CEJ) |
| | ) |
| CAROLYN W. COLVIN, Commissioner | ) |
| of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I. Procedural History

On November 13, 2009, plaintiff Keith Zoll filed applications for a period of disability and disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, (Tr. 135-138), and for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of July 15, 2009. (Tr. 132-134). After plaintiff's application was denied on initial consideration (Tr. 67-71), he requested a hearing from an Administrative Law Judge (ALJ). See Tr. 64-70 (acknowledging request for hearing).

Plaintiff and counsel appeared for a video hearing on September 27, 2011. (Tr. 28-43). On November 2, 2011, the ALJ issued a decision denying plaintiff's application (Tr. 7-27), and the Appeals Council denied plaintiff's request for review on October 15,

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and should be substituted for Michael J. Astrue as the defendant in this suit. No further action need to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2012. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

In his Disability Report (Tr. 179-186), plaintiff listed his disabling conditions as spinal and neck pain, spinal fusion of C-5, C-6, and C-7, and medication side effects. Plaintiff stated that he does not have full rotation of his neck; is unable to reach his arms over his head or lay down on a hard surface; has difficulty bending, twisting, crouching, crawling, squatting, and reaching; and cannot lift more than 10 pounds, stand for longer than 45 minutes, or sit for longer than 30 to 45 minutes. Plaintiff completed the twelfth grade and listed his past employment as assembly line worker, construction worker, irrigation worker, long-haul truck driver, and window installer.

In his Function Report (Tr. 199-210), plaintiff stated that his typical day includes waking up around 7:00 a.m., drinking coffee, walking for approximately one mile, and watching television. Plaintiff stated that he tries to stay active and goes outside two to three times per day. Plaintiff stated that he needs to rest for a couple of minutes after walking a quarter of a mile. Plaintiff is able to prepare his own meals, clean dishes, do laundry, drive, shop, and follow instructions. Plaintiff stated that he does not have any problems getting along with others. Plaintiff claimed that he is unable to have sex, play softball, take care of his grandchildren, lay in one position for over two hours, or lift over 10 pounds. Plaintiff stated that he has been in pain since his surgery and cannot turn his head in either direction, which makes him afraid to drive.

## B. Hearing on September 27, 2011

At the time of the hearing, plaintiff was 44 years old, 5' 7" tall, and weighed 170 pounds. (Tr. 31). Plaintiff testified that on July 15, 2009, he was working as a farmer when he injured a disc in his neck and a nerve in his left arm. (Tr. 31-32). Plaintiff testified that he has no strength in his left arm, poor range of motion in his neck, and continuous pain in his left arm and shoulder. (Tr. 32-33). Plaintiff explained that he was no longer taking pain medication because his "insurance was cut off" and he could no longer see his doctor. (Tr. 33).

Plaintiff testified that he is unable to reach his left hand over his head or in front of him without experiencing pain and that he is unable to grasp or hold items with his left hand. (Tr. 33-34). Plaintiff estimated that he could lift 10 pounds a couple of times per day, but that his doctor limited him to lifting less than 10 pounds. (Tr. 34-35). Plaintiff testified that he is able to operate tools (such as wrenches, screwdrivers, and drills) with his right hand. (Tr. 35). Plaintiff stated that he can sit for approximately 30 minutes before he has to get up and walk. (Tr. 36).

Plaintiff stated that he takes Tylenol and uses a heat pack and a cold pack at night for pain. Plaintiff testified that he does not sleep well because of the pain and that the lack of sleep makes him tired throughout the day. (Tr. 36-37). Plaintiff testified to having three hernias, which doctors refuse to treat due to his lack of insurance . (Tr. 37-38). Plaintiff stated that he feels depressed and is often in a bad mood. (Tr. 38-39). Plaintiff testified to having the ability to cook and shop, but stated that he does not drive and can no longer hunt or play softball. (Tr. 39-41). Plaintiff stated that he has no household income and that both he and his fianceé receive food stamps. (Tr. 42).

## C. Medical Evidence

On January 31, 2009, plaintiff saw James Wilkerson, M.D. at the Kneibert Clinic for complaints of right hand pain and swelling. (Tr. 286-290). Plaintiff stated that the pain began the day before the appointment when he "jammed [his] knuckles into [a] 2 by 6 board." (Tr. 286). A hand x-ray revealed normal alignment, moderately severe soft tissue swelling, and some calcification. (Tr. 289). Dr. Wilkerson suspected tenosynovitis,[2] instructed plaintiff to place ice on the area, prescribed Naproxen[3] and Ultracet,[4] and told plaintiff to return if the pain persisted. (Tr. 287).

On July 14, 2009, plaintiff saw Dr. Wilkerson for neck pain that began the day before. (Tr. 284-285). Treatment notes state that plaintiff "felt a pull" when he was "yanking on pipe wrench." A physical examination revealed no acute distress and full range of motion in his neck and shoulder. (Tr. 284). Dr. Wilkerson diagnosed plaintiff with a muscle strain, prescribed Darvocet[5] and Naproxen, and provided him with a note excusing him from work for two days. (Tr. 283, 285).

On July 18, 2009, plaintiff saw Gary Dausmann, M.D. at the Kneibert Clinic with complaints of neck pain and numbness in his left arm. (Tr. 279-281). Treatment notes

---

[2] Tenosynovitis is inflammation of the lining of the sheath that surrounds a tendon. http://www.nlm.nih.gov/medlineplus/ency/article/001242.htm (last visited Dec. 4, 2013).

[3] Naproxen is the generic name for Naprosyn, a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendonitis and pain management. See Phys. Desk Ref. 2769-70 (60th ed. 2006).

[4] Ultracet is indicated for the short term (five days or less) management of acute pain. See Phys. Desk Ref. 1462-63 (60th ed. 2006).

[5] Darvocet is the brand name for Propoxyphene and is used to relieve pain. http://www.nlm.nih.gov/medlineplus/ency/article/002537.htm (last visited Dec. 4, 2013).

4

stated that there was no recent injury, but that plaintiff had suffered a neck injury "many years ago." (Tr. 279). An x-ray of the cervical spine revealed normal results. (Tr. 282). Dr. Dausmann ordered an MRI, prescribed Lorcet,[6] and provided him with a note excusing him from work for 5 days. (Tr. 178, 281). The MRI of the cervical spine was performed on July 20, 2009. (Tr. 297-292).

On July 22, 2009, plaintiff returned to Dr. Dausmann for a follow-up appointment. (Tr. 293-295). Plaintiff complained of persistent neck pain and weakness of the biceps. Dr. Dausmann wrote that the MRI results revealed discherniation of the C5 and C6. Dr. Dausmann diagnosed plaintiff with radiculopathy of the left sixth cervical nerve, referred plaintiff to a neurosurgeon, and refilled the Lorcet prescription.

On August 4, 2009, plaintiff saw Jason Bowers, PA-C and Paul Tolentino, M.D. at the Brain and NeuroSpine Clinic of Missouri. (Tr. 241-248). Plaintiff described his pain to be a 10 out of 10. A motor exam revealed 5/5 strength in all major muscle groups, normal gait, normal thoracic/lumbar spine range of motion, and full cervical range of motion in all cardinal directions without tenderness, except for limited flexion, extension, and rotation. (Tr. 244-245). The diagnostic impression was described as left C5-6 herniated nucleus pulposus with resultant left upper extremity pain in a C6 distribution, mild multilevel cervical spondylosis and degenerative disc disease, and chronic superior C7 endplate compression deformity. (Tr. 246). Plaintiff was instructed to begin physical therapy 3 times per week for 6 weeks and was prescribed Medrol

---

[6] Lorcet is a brand name for hydrocodone bitartrate. See Phys. Desk Ref. 1027 (53rd ed. 1999). Hydrocodone bitartrate is a synthetic narcotic analgesic and antitussive with actions similar to codeine and is indicated for the relief of moderate to moderately severe pain. Id. at 1486.

Dosepak,[7] Robaxin,[8] and Vicoden. (Tr. 246-247).

On August 7, 2009, plaintiff returned to Dr. Dausmann for complaints of left shoulder pain. (Tr. 296-298). An exam revealed mild weakness of the left biceps and decreased range of motion in the neck. Dr. Dausmann listed radiculopathy, neck pain, and anxiety as the diagnoses, instructed plaintiff to follow up as needed, refilled plaintiff's Lorcet, and prescribed Vistaril[9] for anxiety. (Tr. 297-298).

On August 31, 2009, plaintiff underwent an electrodiagnostic study of the bilateral upper extremities. (Tr. 249-251). The results revealed left C6 and C7 acute radiculopathy and chronic denervation and reinnervation, moderately severe bilateral carpal tunnel syndrome with acute denervation and chronic reinnervation on the left and chronic reinnervation on the right, mild left ulnar neuropathy at the wrist, and mild ulnar axonopathy across the right elbow. (Tr. 251). After the testing was completed, plaintiff saw Dr. Tolentino and Patrick Hammond PA-C. (Tr. 252-258). Plaintiff reported mild relief from the physical therapy, but stated that the pain returns after each session. Plaintiff denied any right arm symptoms and described his pain as a 7 out of 10. (Tr. 252). Dr. Tolentino and plaintiff discussed various non-surgical and surgical treatments options. Plaintiff elected to pursue cervication fusion surgery. (Tr. 257). The

---

[7] Methylprednisolone, brand name Medrol, relieves inflammation and is used to treat certain forms of arthritis. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682795.html (last visited Dec. 4, 2013).

[8] Methocarbamol, brand name Robaxin, is a muscle relaxant and is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682579.html (last visited Dec. 4, 2013).

[9] Vistaril is indicated for the symptomatic relief of anxiety associated with psychoneurosis. See Phys. Desk Ref. 2217 (52d ed. 1998).

surgery was performed on September 4, 2009. (Tr. 231-237).

Plaintiff saw Dr. Tolentino for a postoperative visit on September 15, 2009. (Tr. 259-264). Plaintiff reported a reduction in pre-surgical symptoms, aching in his posterior cervical and trapezius region bilaterally, minor aching in his left elbow, and residual numbness in his left forearm and thumb. Plaintiff described his pain as a 7 out of 10 and stated that he was taking Percocet[10] and Flexeril[11] for discomfort and wearing his Miami J collar[12] and bone growth simulator daily. (Tr. 259). Plaintiff was told that he could begin to wean out of the collar on September 22nd. Plaintiff was given a refill of Percocet and Flexeril and was instructed to refrain from driving until he no longer needed the pain medications and collar. He was told to return for a follow-up in 4 to 6 weeks and was instructed to refrain from working until the appointment. (Tr. 262).

On October 19, 2009, plaintiff returned to Dr. Tolentino for his second postoperative follow-up, which included an x-ray of the cervical spine. (Tr. 265-271, 334-336). Plaintiff reported a "significant decrease in his preoperative pain and paresthesia," "denied any radiation of pain into his arms," and "discontinued the use of pain medication and muscle relaxants." Plaintiff reported some stiffness in his neck, mild paresthesia in his left thumb and index finger, and a mild amount of grip strength

---

[10] Ocycodone acetaminophen is also known as Percocet. Ocycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain. It can produce drug dependence. See Phys. Desk. Ref. 1114 (60th ed. 2006).

[11] Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute musculoskeletal conditions. See Phys. Desk Ref. 1832-33 (60th ed. 2006).

[12] Miami J collars are often prescribed for both extrication stabilization of trauma patients and a treatment option of injuries to the cervical spine. http://www.ncbi.nlm.nih.gov/pubmed/15698698 (last visited Dec. 4, 2013).

loss in his left hand. Plaintiff described his pain as a 4 out of 10. (Tr. 265). Plaintiff expressed concern with returning to work as a manual laborer. Plaintiff was instructed to undergo physical therapy prior to returning to work and was given a muscle relaxant for morning stiffness. (Tr. 268-269).

On January 25, 2010, James Morgan, Ph.D. completed a Psychiatric Review Technique report. (Tr. 303-313). Dr. Morgan determined that plaintiff's anxiety-related disorders were non-severe impairments. (Tr. 303, 313). Dr. Morgan concluded that plaintiff had mild difficulties in maintaining concentration, persistence or pace, but did not have restrictions in activities of daily living or difficulties in maintaining social functioning and did not have repeated episodes of decompensation. (Tr. 311).

On April 14, 2010, plaintiff saw Naveed J. Mirza, M.D. for a psychiatric evaluation. Plaintiff's reliability was described as "fair." Plaintiff stated that he felt uncomfortable in social situations where there were numerous people present and that he cries and feels helpless when he becomes nervous. Plaintiff stated that "since being laid off his life feels very different and he does not know how to find another job making him increasingly nervous, having decided to apply for disability." (Tr. 322). Plaintiff denied any depressive, manic or psychotic symptoms. Plaintiff admitted to using marijuana 1 to 2 times per week for the past 3 months to help him "calm down." (Tr. 324). Dr. Mirza wrote that plaintiff did not have a mental health illness that would prevent him from seeking employment. Dr. Mirza described plaintiff's stressors as economic concerns and a fear of being unable to find work due to his limited skills and medical problems. (Tr. 327).

On August 16, 2011, plaintiff went to the emergency room at Missouri Southern

Healthcare with complaints of left groin pain. Plaintiff underwent an abdomen x-ray and was diagnosed with a left inguinal hernia. Plaintiff was instructed to follow up with his surgeon. (Tr. 339-351).

### III. The ALJ's Decision

In the decision issued on November 2, 2011, the ALJ made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2013.

2. Plaintiff has not engaged in substantial gainful activity since July 15, 2009, the alleged disability onset date.

3. Plaintiff has the following severe impairments: disorders of the back (discogenic and degenerative) with the residuals of cervical spine fusion surgery.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity (RFC) to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the plaintiff, who, with normal breaks, is able to lift/carry and push/pull ten pounds occasionally and less than ten pounds frequently, and who is further able to stand/walk two out of eight hours and sit for six out of eight hours for a total of eight out of eight hours, should avoid working at unprotected dangerous heights and around unprotected dangerous machinery; and should avoid concentrated exposure to extreme cold or to extreme heat. The ALJ did not consider any effects of plaintiff's marijuana use.

6. Plaintiff is capable of performing past relevant work as an over-the-road commercial truck driver. This work does not require the performance of work-related activities precluded by plaintiff's residual functional capacity.

7. Plaintiff has not been under a disability, as defined in the Social Security Act, from July 15, 2009, through the date of this decision.

(Tr. 10-27).

## IV. Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove that he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and

(3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of

disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff contends that the ALJ erred by improperly analyzing plaintiff's RFC and

by failing to find plaintiff's carpal tunnel syndrome and anxiety to be severe impairments.

## Residual Functional Capacity

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted); 20 C.F.R. § 404.1545(a)(1). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (citation omitted). However, even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)); see also Dykes v. Apfel, 223 F.3d 665, 666 (8th Cir. 2000) (RFC is a determination based on all record evidence, not only medical evidence).

The ALJ determined that plaintiff has the RFC to perform sedentary work, except the plaintiff, who with normal breaks, is able to lift/carry and push/pull 10 pounds occasionally and less than 10 pounds frequently, is able to stand/walk 2 out of 8 hours and sit for 6 out of 8 hours for a total of 8 out of 8 hours, should avoid working at unprotected dangerous heights and around unprotected dangerous machinery, and should avoid concentrated exposure to extreme cold or heat. (Tr. 13).

Plaintiff argues that the ALJ failed to specify what evidence was relied on in forming the RFC and failed to provide a "logical bridge between the medical evidence and the result." The Court disagrees. The ALJ's decision includes numerous references

to plaintiff's medical record, including diagnostic tests and physical examinations, plaintiff's own reports of his symptoms and improvements to his physicians, and plaintiff's "spotty" work and earnings history. Furthermore, the ALJ explained in great detail his reasons for discounting plaintiff's testimony regarding the severity of his impairments.

In the decision, the ALJ addressed plaintiff's July 2009 hand injury. The ALJ acknowledged the results of plaintiff's diagnostic imaging and nerve conduction studies, which revealed disc bulge, radiculopathy, carpal tunnel syndrome, acute and chronic denervation and reinnervation, and ulnar neuropathy and axonopathy. The ALJ addressed plaintiff's cervical surgery and the diagnosis of left C5-6 herniated nucleus pulposus and degenerative disc disease with radiculopathy. The ALJ referred to treatment notes, which permitted plaintiff to resume driving on September 22, 2009, and an instruction that plaintiff begin increasing the amount of weight he can lift. The ALJ noted that there was no evidence in the record supporting plaintiff's testimony that his surgeon permanently limited plaintiff to lifting less than 10 pounds.

The ALJ noted that in October 2009 plaintiff was permitted to discontinue use of pain medications and muscle relaxants due to a decrease in pre-surgical symptoms. The ALJ considered plaintiff's reports to his physician that he was pleased with the outcome of his cervical surgery and had an overall decrease in pain and discomfort. The ALJ noted that this report conflicted with plaintiff's testimony of severe and debilitating pain.

The ALJ further acknowledged that plaintiff was diagnosed with bilateral inguinal hernias, but took note of the fact that the treating physician described the hernias as

14

small and ordered conservative treatment. The ALJ also observed that none of plaintiff's treating physicians provided him with an ambulation-assisting device, stated or implied that plaintiff was disabled, or placed any long-term limitations on the plaintiff's abilities to stand, sit, walk, bend, lift, or carry.

The ALJ found little merit in plaintiff's explanation that he was unable to seek additional medical treatment or obtain pain medication refills due to a lack of insurance coverage. The ALJ observed that plaintiff was financially able to purchase marijuana and cigarettes and failed to submit any evidence showing that was denied participation in a subsidized or low cost prescription program. The ALJ further expressed the opinion that plaintiff's testimony at the hearing seemed rehearsed and contradictory to his disability paperwork. For example, the ALJ commented on how plaintiff's testimony regarding his inability to grasp items, such as a drinking glass, did not comport with his disability paperwork reporting his ability to cook and clean.

In terms of mental health, the ALJ acknowledged that an August 4, 2009 treatment note reported a diagnosis of anxiety. However, the ALJ also noted that other medical records did not reflect any mental health issues and did not evidence an attempt by plaintiff to seek mental health treatment or counseling. Although plaintiff reported to a consultative physician that he could not tolerate crowds and suffered from crying spells, plaintiff testified that he was able to shop and get along with others. The consultative physician opined that plaintiff did not have any mental health issues that would prevent him from maintaining employment.

These considerations, taken as a whole, sufficiently support the ALJ's RFC determination and show that the ALJ's conclusions are supported by substantial

evidence. The ALJ's detailed analysis does not support a finding that the ALJ made his own medical determinations or failed to rely on medical evidence. Furthermore, as part of his RFC analysis, the ALJ appropriately addressed plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms and concluded that they were not entirely credible. The ALJ may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the Court will usually defer to the ALJ. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).

Additionally, plaintiff briefly argues that the ALJ should have sought additional medical evidence to determine disability, but he does not specify what additional information should have been obtained. This argument also fails. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) ("Without informing the court what additional medical evidence should be obtained . . . [plaintiff] has failed to establish that the ALJ's alleged failure to fully develop the record resulted in prejudice, and has therefore provided no basis for remanding for additional evidence."). Furthermore, an ALJ need not order a consultative examination or re-contact physicians if the record contains substantial evidence to support the decision. See Bradford v. Colvin, 4:12-CV-1234 (E.D. Mo. Sept. 23, 2013) (citing Haley v. Massanari, 258 F.3d 741, 749 (8th Cir. 2001)); see also Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004).

**Carpal Tunnel Syndrome and Anxiety**

In his application for disability benefits, plaintiff alleged disability due to spinal

16

and neck pain, spinal fusion of C-5, C-6, and C-7, and medication side effects. At Step 2 of the sequential evaluation, the ALJ determined plaintiff's carpal tunnel syndrome and anxiety to be nonsevere impairments and his discogenic and degenerative back disorders with the residuals of cervical back fusion surgery to be severe impairments.

The Social Security regulations define a nonsevere impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. See 20 CFR §§ 404.1521(a), 416.921(a). Under the regulations, the ALJ must evaluate the severity of mental impairments by gauging their impact on four functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. See 20 C.F.R. § 404.1520a(c)(3). The regulations further provide that if the ALJ rates plaintiff's limitations as "none" or "mild" in the first three areas, and "none" in the fourth area, the ALJ will generally conclude that the claimant's mental impairments are not severe, unless the evidence indicates that there is more than a minimal limitation in the plaintiff's ability to perform basic work activities. Partee v. Astrue, 638 F.3d 860 (8th Cir. 2011); 20 CFR § 404.1520a(d)(1).

Plaintiff asserts that the ALJ erred in finding that his carpal tunnel syndrome and anxiety disorder were nonsevere impairments. In support, plaintiff relies on his August 31, 2009 electrodiagnostic study, which revealed moderately severe carpal tunnel syndrome, his September 15, 2009 complaints of forearm and thumb numbness, and his October 10, 2009 diagnosis of radiculopathy. Plaintiff does not present any argument for why or how the ALJ erred in his determination that plaintiff's anxiety disorder was not a severe impairment.

17

The Court finds that the ALJ's determination regarding the severity of both conditions is supported by substantial evidence in the record. While it is true that plaintiff was diagnosed with carpal tunnel syndrome, the ALJ acknowledged this in his RFC analysis and proceeded to discuss the symptoms associated with the condition. For example, the ALJ noted that on October 19, 2009, plaintiff reported mild grip weakness in his left hand. "[F]ailing to find a particular impairment severe does not require reversal where the ALJ considers all of a claimant's impairments in his or her subsequent analysis." Hankinson v. Colvin, 2013 WL 1294585, *12 (E.D. Mo. Mar. 28, 2013). Additionally, none of plaintiff's physicians expressed concern, placed limitations on his abilities, or even mentioned the diagnosis of carpal tunnel syndrome in subsequent treatment records.

With regard to plaintiff's mental health issues, the ALJ acknowledged in his RFC analysis that plaintiff was diagnosed with anxiety on August 4, 2009. However, as the ALJ noted, there was no evidence that plaintiff sought treatment from a mental health facility, was hospitalized for any mental health issues, or that the anxiety could not be controlled with medication. None of plaintiff's physicians expressed concern regarding plaintiff's mental health. Furthermore, the consultative examiner who performed a psychiatric examination on plaintiff reported that plaintiff denied feelings of depression, attributed his stress to economical fears, and assigned him a GAF of 60.[13] Additionally, Dr. Morgan, who completed a Psychiatric Review, determined that plaintiff's anxiety-

---

[13] A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (E.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

related disorders were non-severe impairments and that plaintiff had mild difficulties in maintaining concentration, persistence or pace, but did not have restrictions in activities of daily living or difficulties in maintaining social functioning and did not have repeated episodes of decompensation.

Considering the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision regarding the severity of plaintiff's carpal tunnel syndrome and anxiety.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his brief in support of complaint [Doc. #11] is **denied**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 29th day of January, 2014.